2022 UT App 7

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
EDDIE ANGELO SAMORA,
Appellant.

Opinion
No. 20190662-CA
Filed January 21, 2022

Second District Court, Farmington Department
The Honorable John R. Morris
No. 171701971

Scott L. Wiggins, Attorney for Appellant

Sean D. Reyes and Jeffrey S. Gray,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

ORME, Judge:

¶1     Eddie Angelo Samora challenges his convictions for
attempted murder and possession of a firearm by a restricted
person. Samora contends that errors made by the district court
and his trial counsel warrant reversal of his convictions and a
new trial. We disagree and affirm.

BACKGROUND[1]

¶2 On October 26, 2017, as the victim (Victim) played with his three young sons outside the first-floor apartment where the boys lived with their mother (Wife), Samora shot Victim multiple times with a .22 revolver in front of Wife and their sons. Victim was severely injured and would have died absent the immediate medical attention he fortunately received. Security cameras at the apartment building captured a portion of the shooting.

¶3 A witness (Witness 1), who knew Samora, was outside in the parking lot working on his car when he heard gunshots. He looked up to see Victim lying on the ground and Samora shoot Victim. Witness 1 then left the area because he did not want to be called as a witness. He did, however, have a phone conversation with police that day, during which he denied seeing who shot Victim. A few days later, this time speaking to police in person, Witness 1 confirmed that Samora was the shooter.

¶4 Another witness (Witness 2) heard "some screaming and yelling" as he stood outside his apartment approximately 80 to 100 yards away. As he turned to look in the direction of the noise, he saw Victim fall to the ground and then saw a "stocky" Hispanic male come into view and shoot Victim.

¶5 The day after the shooting, the State charged Samora with attempted murder and unlawful possession or use of a firearm by a restricted person. The State alleged that Samora was a restricted person because he previously served time in federal prison for armed carjacking and for brandishing a firearm during a crime of violence. After shooting Victim, Samora fled to

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

Nevada and evaded arrest, but he was apprehended approximately six weeks later and extradited to Utah.

¶6    Samora, temporarily represented by a public defender, made his initial appearance on December 15, 2017, and informed the court that he was unsure whether he could afford to retain private counsel. The public defender requested that a hearing be held the next week to give Samora time to obtain private counsel. The court granted the request and scheduled a hearing for December 22. For unknown reasons, that hearing was then rescheduled to January 8, 2018. At the January 8 hearing, Samora appeared and, through the same public defender, informed the court that he would not be able to retain private counsel. The court then appointed a different public defender (Trial Counsel) to represent Samora. At Samora's request, another hearing was scheduled for January 24. At that hearing, Trial Counsel requested a continuance of "about six weeks." The court granted the request and scheduled the hearing for March 9. For unknown reasons, the March 9 hearing was rescheduled for April 11.

¶7    At the April 11 hearing, Samora conditionally waived his right to a preliminary hearing, and the district court bound the case over for trial. The court then scheduled the next hearing, at Trial Counsel's request, for April 30. At the end of this next hearing, Trial Counsel requested that the matter be set "out a month," and the court offered options of four and five weeks away. Trial Counsel chose the latter date, June 4. At the June 4 hearing, Trial Counsel requested that the case be set for a preliminary hearing after all and offered three dates on which he was available. The prosecutor was available only on the latest proposed date, July 20, and Trial Counsel represented that Samora was "okay with that."

¶8    At the July 20 preliminary hearing, the State called as witnesses, among others, Wife and Witness 1. Wife, however, refused to testify because she did not want "to put [herself] or [her] children in any more danger than what they've already

been in." The court held her in contempt and jailed her until she agreed to testify. Due to Wife's reluctance to testify, the State requested a continuance, and the court continued the preliminary hearing without scheduling a specific date for resumption of the hearing. At this point, Trial Counsel asserted that Samora is "asking to have his right to a quick and speedy trial and invoke that process today."

¶9     The preliminary hearing was subsequently rescheduled for September 10. At the beginning of that hearing, Trial Counsel requested a six-week continuance to give Samora an opportunity to obtain private counsel. The court denied that request and proceeded to bind Samora over for trial without taking additional evidence because it determined Wife's testimony was not needed for the bindover. Trial Counsel then asked for the arraignment to be scheduled in six weeks, and the court offered either October 22—six weeks out—or October 29—seven weeks out—and both Trial Counsel and Samora responded that they preferred the October 29 option.

¶10     At his October 29 arraignment, Samora pled not guilty and Trial Counsel asked that the matter be set for further review in "six to eight weeks." Samora then personally confirmed that this was what he wanted. The court inquired whether Samora wanted it scheduled on, before, or after December 31. Trial Counsel represented that Samora was content with the matter being scheduled in January, and the court scheduled it for January 7, 2019.

¶11     At the January 7 review hearing, Trial Counsel requested yet another six-week continuance because Samora was in the process of retaining private counsel and was currently "working out a payment plan." Citing the age of the case, the court denied the request, but granted Samora three weeks to get things in order and scheduled a pretrial conference for January 28. At the pretrial conference, Trial Counsel again appeared, Samora having apparently been unsuccessful in his effort to retain private counsel. Trial Counsel requested a four-day jury trial.

The court was unable to schedule four consecutive days for a trial, but Trial Counsel agreed to conduct jury selection a week before putting on evidence. Trial Counsel then agreed to have jury selection on April 25 and the rest of the trial on May 1 through May 3.

¶12   At the beginning of jury selection, the district court mentioned that the State had charged Samora with the "crimes of attempted murder and purchase, transfer, possession or use of a firearm by a restricted person." The court so advised the jury pool even though the latter charge was to be tried separately and only after the jury reached a verdict on the primary charge. Later, the court repeated to the jury pool that "Samora is alleged to have committed . . . attempted homicide and possession of a firearm by a restricted person." One of the prospective jurors asked for "clarification" about the charges, "attempted murder and illegal—," at which point the court interjected and stated that the second charge was "basically, possession of a firearm or transport of a firearm as a restricted person" and provided no further explanation. These were the only references made to the restricted-person charge during jury selection, and the court did not disclose that Samora had prior felony convictions.

¶13   At trial, Victim testified about the shooting, as did Witness 1 and Witness 2.[2] Witness 1 testified that he saw Samora shoot Victim multiple times. Victim testified that he was shot just outside Wife's apartment while reaching down to pick up one of his sons. He stated he did "[n]ot specifically" see Samora with a gun but that he could see Samora "in front of [him] moving around" as he was being shot. He also testified that Samora and Wife were arguing right before the shooting, and he just heard "pops" and felt pressure in his torso, hip, and chest before losing consciousness. Witness 2 testified that while he

---

2. The prosecution struck a deal with Victim that if he testified about the shooting, Wife would not be called to testify or charged with obstruction of justice.

was too far away to identify who shot Victim, he could tell the shooter was a "Hispanic [male of] stocky build."[3] The jury was also shown footage from the surveillance cameras that corroborated all the testimony. That footage showed Victim playing with his sons at the apartment complex and Samora arriving in an SUV and walking toward Wife's apartment. The video then showed Victim return to the apartment. The first shot was not captured on the surveillance video, but Victim is seen falling into view of the camera and then Samora is seen firing two more shots at Victim while Wife attempts to stop him.

¶14 As part of his defense, Samora called a detective from the county sheriff's office to testify about the recoil of the weapon used to shoot Victim, as seen on the surveillance footage.[4] The detective testified that the height of the suspected shooter's arm after shooting the gun was not consistent with "the recoil that would come with the weapon shooting [a .22] caliber" round, and he would have expected it to be a larger caliber. On cross-examination, the detective conceded that he had not examined the actual revolver used in the case and as such could not "testify with certainty regarding the recoil of that particular weapon." Samora did not testify in his own defense. The jury convicted Samora of attempted murder. Following that conviction, the restricted person charge was tried before the same jury, which also convicted him on that charge. Samora appeals.

---

3. Witness 2's description of the shooter was consistent with Samora's appearance.

4. Samora also called his mother to testify, but her testimony was limited to simply stating that she was Samora's mother and that he was her only son. Trial Counsel asked her no other questions.

ISSUES AND STANDARDS OF REVIEW

¶15  Samora raises four issues on appeal. First, he asserts that the district court erred in not ruling, sua sponte, that he had been deprived of his constitutional right to a speedy trial. Second, he asserts that Trial Counsel was ineffective for not requesting a dismissal on the ground that his right to a speedy trial was violated. Third, he contends that the court erred in telling the prospective jurors that he was charged with unlawfully possessing or using a firearm as a restricted person. Finally, Samora argues that Trial Counsel was ineffective for not objecting to the court's references to the restricted-person charge during jury selection.

¶16  Samora concedes that he did not preserve these issues but nonetheless asks us to review them under the plain error and ineffective assistance of counsel exceptions to the preservation requirement. *See generally State v. Johnson*, 2017 UT 76, ¶ 19, 416 P.3d 443. Claims for plain error and ineffective assistance of counsel present questions of law, which we evaluate for correctness. *See State v. Popp*, 2019 UT App 173, ¶ 19, 453 P.3d 657. "To establish plain error, [a defendant] must show that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error was harmful." *State v. Marquina*, 2020 UT 66, ¶ 30, 478 P.3d 37 (quotation simplified). An ineffective assistance of counsel claim, on the other hand, requires a defendant to prove both that "counsel's performance was deficient" and "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

ANALYSIS

I. Speedy Trial

¶17  Samora raises two issues with regard to his right to a speedy trial. First, he asserts that the district court erred in not ruling, sua sponte, that his right had been violated. Next, he

contends that Trial Counsel was ineffective for failing to move for a dismissal based the violation of his right to a speedy trial. As we discuss below, Samora's right to a speedy trial was not violated, and therefore both of these claims are unavailing. Samora has not shown any error, let alone obvious error, to support a plain error claim, and he cannot establish that Trial Counsel was ineffective for forgoing a futile motion.

¶18 The Sixth Amendment to the United States Constitution grants defendants "the right to a speedy and public trial." U.S. Const. amend. VI. "The right does not arise until there has been an indictment or information." *State v. Younge*, 2013 UT 71, ¶ 16, 321 P.3d 1127 (quotation simplified). The "right is amorphous, slippery, and necessarily relative," *Vermont v. Brillon*, 556 U.S. 81, 89 (2009) (quotation simplified), as it must take into account the defendant's rights as well as "the rights of public justice," *Beavers v. Haubert*, 198 U.S. 77, 87 (1905). Thus, a speedy trial does not mean an immediate trial because "[o]ur speedy trial standards recognize that pretrial delay is often both inevitable and wholly justifiable." *See Doggett v. United States*, 505 U.S. 647, 656 (1992). *See also Beavers*, 198 U.S. at 87 ("The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances."). Therefore, there is no "specified number of days or months" that dictate when a defendant's right to a speedy trial has been violated. *Brillon*, 556 U.S. at 89 (quotation simplified). Rather, the United States Supreme Court has established a test, known as the *Barker* inquiry, that courts must undertake to determine whether the speedy-trial right has been violated. *See Barker v. Wingo*, 407 U.S. 514, 530 (1972).

¶19 The *Barker* inquiry essentially boils down to a two-part test. First, the court must determine whether "the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay." *See Doggett*, 505 U.S. at 651–52 (quotation simplified). Following the United States Supreme Court's suggestion, the Utah Supreme Court has recognized that an accusation-to-trial interval "approaching one year is presumptively prejudicial." *Younge*, 2013 UT 71, ¶ 18. If a

defendant cannot prove that this threshold has been met, then the inquiry ends because the defendant "cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness." *Doggett*, 505 U.S. at 652. *See also Younge*, 2013 UT 71, ¶ 18 ("If the delay is not uncommonly long, the inquiry ends there.") (quotation simplified). But if the defendant can show that the time from accusation to trial is "presumptively prejudicial,"[5] then courts proceed to step two of the inquiry and employ "a balancing test, in which the conduct of both the prosecution and the defendant are weighed." *Barker*, 407 U.S. at 530. This balancing encompasses four factors: (1) the "[l]ength of delay," (2) "the reason for the delay," (3) "the defendant's assertion of his right," and (4) "prejudice to the defendant." *Id.* The *Barker* court also noted:

> We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.

*Id.* at 533.

---

5. The United States Supreme Court has "note[d] that, as the term is used in this threshold context, 'presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger [step two of] the *Barker* enquiry." *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992).

¶20    Here, approximately eighteen months passed between the time the State charged Samora and the beginning of the trial. Because this delay was well beyond one year, it was presumptively prejudicial. Accordingly, we proceed to address step two of the *Barker* inquiry and consider the four factors.

A.    Length of Delay

¶21    Under the first of the four factors, we "consider . . . the extent to which the delay stretche[d] beyond the bare minimum needed to trigger judicial examination of the claim." *See Doggett*, 505 U.S. at 652. This "enquiry is significant to the speedy trial analysis because . . . the presumption that pretrial delay has prejudiced the accused intensifies over time." *Id.*

¶22    Here, the delay was about six months beyond the presumptively prejudicial time of approximately one year between being charged and being tried. But considering the seriousness of the principal charge against Samora—attempted murder—we do not see an additional six-month delay as being cause for significant concern. This is so because cases of this magnitude often require more time for both the prosecution and the defense to prepare for trial. Therefore, this factor is relatively inconsequential in this case.

B.    Reasons for the Delay

¶23    The second factor considers "whether the government or the criminal defendant is more to blame for [the] delay." *Id.* at 651. Under this factor, the prosecution's reasons for delay can be entirely reasonable, such as "need[ing] time to collect witnesses against the accused, oppos[ing] his pretrial motions, or, if he goes into hiding, track[ing] him down." *Id.* at 656. Such reasons are "wholly justifiable" and given "great weight . . . when balancing them against the costs of going forward with a trial whose probative accuracy the passage of time has begun by degrees to throw into question." *Id.* But "[a] deliberate attempt to delay the trial in order to hamper the defense should be

weighted heavily against the government." *Barker*, 407 U.S. at 531. Finally, "[a] more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Id.*

¶24 On the other hand, when a defendant "acts to delay trial, he indicates his willingness to temporarily waive his right to a speedy trial. This is true whether or not the reason for the delay is meritorious." *State v. Ossana*, 739 P.2d 628, 631 (Utah 1987) (footnote omitted). *See Barker*, 407 U.S. at 529 ("We hardly need add that if delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine, the demand rule aside."). "Consequently, when a defendant affirmatively agrees to a scheduled [hearing] date and offers no subsequent objection to that date, he cannot then turn around and count those days leading up to the agreed upon trial date in his determination of delay for speedy trial purposes." *State v. Cornejo*, 2006 UT App 215, ¶ 28, 138 P.3d 97.

¶25 Here, Samora delayed his trial by nearly eight months through his own continuance requests. The following were all delays that Samora requested and was granted:

- At his initial appearance on December 15, 2017, Samora requested a one-week delay to determine if he could hire private counsel.

- At the hearing on January 24, 2018, Trial Counsel requested a six-week continuance to obtain discovery and review it with Samora.[6]

---

6. On appeal, Samora has not argued that the State was late in providing discovery.

- At the hearing on April 11, 2018, after Samora conditionally waived his right to a preliminary hearing, Trial Counsel requested a roughly two-and-a-half-week delay for the next hearing to be held.

- At the hearing on April 30, 2018, the court asked Trial Counsel when he would like to schedule the next hearing and Trial Counsel suggested the hearing be held in a month. The court only had a date either three weeks or five weeks out, and Trial Counsel asked for the date five weeks out.

- At the continued preliminary hearing, held on September 10, 2018, Trial Counsel asked for the hearing to be continued six weeks because Samora's family was attempting to gather funds to retain private counsel for Samora. The court denied the request and proceeded to bind Samora over for trial. When the court inquired about a date to hold the upcoming arraignment, Trial Counsel suggested a date six weeks out, and the court offered either October 22—six weeks out—or October 29—seven weeks out—and both Trial Counsel and Samora responded that they preferred the later date, October 29.

- At the October 29 arraignment, Samora pled not guilty and Trial Counsel sought another continuance of six to eight weeks, which Samora personally confirmed. The court then asked whether Samora wanted this review hearing scheduled on, before, or after December 31. Trial Counsel represented that Samora was content with it being scheduled in January and

the court scheduled it for January 7, 2019—ten weeks out.

- At the January 7 review hearing, Samora asked for another six-week continuance to obtain private counsel. Due to how long the case had already run, the court denied that request but did grant Samora three more weeks, until January 28, to see if he could hire private counsel.

¶26 By our tally, Samora requested continuances totaling 34½ weeks, or approximately eight months. These eight months were directly attributable to Samora and thus count as a waiver of the right to a speedy trial during that time period. *See Ossana*, 739 P.2d at 631. Furthermore, Samora fled from the State in an attempt to evade justice, further delaying his case by approximately six weeks. This time is of course attributed to Samora because the delay from the time the State filed charges on October 27, 2017, until his arrest on December 12 in Nevada, "was through no fault of the prosecution and not the result of overcrowded courts or negligence on the part of the State." *See State v. Younge*, 2013 UT 71, ¶ 16, 321 P.3d 1127. *See also Doggett*, 505 U.S. at 656 (stating that if a defendant "goes into hiding," the time taken by the government to "track him down" is "wholly justifiable"). *But see Doggett*, 505 U.S. at 652–53 (holding that the 8½ years it took the government to track down the defendant following the indictment was attributable to the government because the defendant was unaware of his indictment and "[f]or six years, the Government's investigators made no serious effort" to locate the defendant, whom "they could have found . . . within minutes").

¶27 When these time periods are combined, Samora was directly accountable for nearly 9½ months of delay, or slightly more than half of the eighteen-month period from when he was charged until trial. Although there was an additional 8½ months of delay, we need not detail the causes for delay during those

months specifically because they fall well short of the presumptively prejudicial trigger of approximately one year. Had the 9½ months of delays attributable to Samora not occurred, the case would have proceeded to trial well before approaching one year and the presumptively prejudicial time would not have been met. *See Cornejo*, 2006 UT App 215, ¶ 28 (holding that a defendant responsible for the delay "cannot then turn around and count those days leading up to the agreed upon trial date in his determination of delay for speedy trial purposes"). Thus, the reasons for delay weigh against concluding that Samora was deprived of his right to a speedy trial.[7]

---

7. Samora asserts that "the record demonstrates a lack of diligence by the court and the State to bring the matter to trial." But Samora points only to the State's request for a continuance after Wife refused to testify at the first preliminary hearing, which testimony ultimately proved unnecessary for bindover. Based solely on this, Samora claims that "[t]he State's lethargy in bringing the matter to trial is demonstrated by the requested continuance of the preliminary hearing and the subsequent proceedings in which it at least became aware that [Wife's] refusal to cooperate had no significant bearing on the court's probable cause determination." We do not see how seeking one continuance after a witness becomes uncooperative makes the State lethargic in bringing the case to trial. Rather, the State was granted this continuance and at the next preliminary hearing, the matter was promptly bound over. But even if we were to agree with Samora on this point, this single continuance accounts for only seven weeks of the eighteen months it took for the case to get to trial, and Samora points to no other delays that were attributable to the State. Thus, with respect to the reasons for delay, there is little to weigh against the State.

C.     Samora's Assertion of his Right

¶28     At the end of the first preliminary hearing on July 20, 2018, when the district court stated it would reschedule the hearing for an unspecified date due to Wife's refusal to testify, Trial Counsel asserted that Samora was "asking to have his right to a quick and speedy trial and invoke that process today." This factor does not weigh heavily against the State because after invoking his right at that hearing, in subsequent hearings Samora asked for, and was granted, continuances of seven, ten, and three weeks. *See United States v. Oliva*, 909 F.3d 1292, 1301 n.11 (11th Cir. 2018) ("[T]his Court has also determined that, where a defendant asserted his right to a speedy trial but also moved for four continuances prior to that trial, the third *Barker* factor did not weigh 'heavily' against the Government."). When the court twice offered earlier dates for the hearings, Samora instead chose later dates. Seemingly exasperated at the length of time the case had dragged on, at the January 7, 2019 pretrial conference, the State opposed Samora's requested extension, stating that it was "[t]he State's preference . . . just to set this for trial."

¶29     Thus, even after Samora invoked his right to a speedy trial, it was almost exclusively Samora who delayed the trial—not the district court or the State. Accordingly, this factor does not weigh in favor of concluding that Samora's speedy-trial right was violated.

D.     Prejudice to Samora

¶30     "In *Barker*, the Supreme Court identified three different forms of prejudice that the speedy trial right serves to protect against: '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.'" *Younge*, 2013 UT 71, ¶ 25 (quoting *Barker v. Wingo*, 407 U.S. 514, 532 (1972)). Samora claims that he suffered all three forms of prejudice from the eighteen-month delay.

¶31 While it is true that Samora was incarcerated for nearly a year and a half while awaiting trial, this factor does not weigh in favor of Samora because he is the one who requested most of the delay. When a defendant causes the delay, "there is no merit to his speedy trial claim," because he cannot claim prejudice from an action he caused. *See Gattis v. Snyder*, 278 F.3d 222, 230 (3d Cir. 2002). Indeed, in briefing, Samora concedes that his "affirmative showing of prejudice is lacking." We agree, and conclude that this factor does not weigh in favor of concluding that his right to a speedy trial was violated.

E.      Summary

¶32 Not a single factor weighs in favor of concluding that Samora was denied his right to a speedy trial. Accordingly, no error existed, let alone an obvious error, and Samora's plain error claim is unavailing. *See State v. Marquina*, 2020 UT 66, ¶ 30, 478 P.3d 37. Additionally, because Samora was not denied the right to a speedy trial, his claim that Trial Counsel was ineffective for not requesting a dismissal on that basis is likewise unsuccessful because any such request would have been properly rejected by the district court. *See State v. Makaya*, 2020 UT App 152, ¶ 9, 476 P.3d 1025 ("A futile motion necessarily fails both the deficiency and prejudice prongs of the *Strickland* analysis because it is not unreasonable for counsel to choose not to make a motion that would not have been granted, and forgoing such a motion does not prejudice the outcome.").

## II. References to the Restricted Person Charge

¶33 Samora contends that the district court plainly erred in informing the jury pool three times that he had been charged with possessing a weapon as a restricted person and that Trial Counsel was ineffective for not objecting to the court's references. As explained above, the plain error standard and the ineffective assistance standard both require a defendant to establish prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Marquina*, 2020 UT 66, ¶ 30, 478 P.3d 37. And "the

prejudice test is the same whether under the claim of ineffective assistance or plain error." *State v. McNeil*, 2016 UT 3, ¶ 29, 365 P.3d 699.

¶34 To establish prejudice, "a defendant must present sufficient evidence to support a reasonable probability that, but for [the] errors, the result of the proceeding would have been different." *Archuleta v. Galetka*, 2011 UT 73, ¶ 40, 267 P.3d 232 (quotation simplified). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Here, even assuming that the court erred in thrice informing the jury pool that Samora was charged with possession of a firearm by a restricted person, we readily conclude that Samora was not prejudiced by this alleged error and resolve both of Samora's claims on that basis.

¶35 First, the evidence against Samora on the attempted murder charge was overwhelming. *See State v. Lopez*, 2019 UT App 11, ¶ 35, 438 P.3d 950 (holding that based on the "overwhelming evidence . . . introduced at trial," there was "no reasonable probability that," absent the error, the outcome would have been more favorable to the defendant); *State v. King*, 2010 UT App 396, ¶ 35, 248 P.3d 984 ("While we more readily find errors to be harmless when confronted with overwhelming evidence of the defendant's guilt, we are more willing to reverse when a conviction is based on comparatively thin evidence.") (quotation simplified). Although Victim testified that he did "[n]ot specifically" see Samora with a gun, he could see Samora "in front of [him] moving around." Thus, it is logical to conclude that the person moving around in front of Victim while he was being shot would be the one responsible for the shooting. But this was not all the jury heard. It also heard from Witness 1, who categorically stated that he saw Samora shoot Victim multiple times. The jury then heard from Witness 2, who, while not able to specifically identify Samora as the shooter, did witness a Hispanic male of "stocky build," a description that matched Samora, shooting at another man on the ground. As damning as this evidence was, the jury was then able to corroborate all that

testimony by watching the surveillance footage. This footage showed Victim collapse into view after being shot and then be shot two more times by a man who matched all three witnesses' descriptions. And these descriptions were consistent with the appearance of Samora, whom the jurors could see with their own eyes in the courtroom. Thus, there is not "a reasonable probability" that, had the court not informed the potential jurors that Samora was charged with possession of a firearm by a restricted person, the result of the trial on the attempted murder charge would have been different. *See Archuleta*, 2011 UT 73, ¶ 40 (quotation simplified).

¶36 Second, it is far from obvious that the potential jurors understood what being a "restricted person" meant, at least until being instructed on that matter during the bifurcated portion of the trial, given that the term was not explained to them at the time. Samora, however, claims that these references "tainted" "the jury's deliberations . . . from the beginning." In *State v. Toki*, 2011 UT App 293, 263 P.3d 481, we dealt with a nearly identical issue. In that case, the phrase "restricted person" was also mentioned to the prospective jurors but, unlike here, it was erroneously presented to the jury as part of an instruction that it took into deliberations. *Id.* ¶ 26. During deliberations, the jury asked for "clarification" of the phrase "restricted person." *Id.* The district court simply told the jury not to concern itself with the phrase. *Id.* On appeal, the defendant claimed that the jury drew inappropriate inferences about him from the use of the term, which tainted his trial. *Id.* ¶ 27. This court disagreed, stating, "[T]he jury's question indicates that it did not understand the reference in [the instruction] to 'restricted person,' . . . thus undermining Defendant's argument that the improper references had 'necessarily tainted' the jury's deliberations from the beginning." *Id.* ¶ 32. That situation is similar to what happened in the case before us. During voir dire, a prospective juror, who was not selected for the jury, asked for "clarification" about the charges, "attempted murder and illegal—." The court responded that it was "basically, possession of a firearm as a restricted person" and provided no further explanation. Because

the term is not as widely known by laypersons as more common terms like "felon," "criminal," "inmate," and the like, the jurors who actually sat were likely also unfamiliar with the phrase, like the prospective juror in our case and the jurors in *Toki* were. Under the circumstances present here, we cannot conclude there is "a reasonable probability that, but for [the] error, the result of the [attempted murder trial] would have been different." *See Archuleta*, 2011 UT 73, ¶ 40 (quotation simplified).

¶37 Lastly, Samora contends that the court's references to the restricted person charge "caused the jury to speculate that [he] was unable to posses a firearm because of a criminal past." But until the time came for presenting evidence on that charge, the jury was never informed that Samora *was* a restricted person—just that he was accused of being one. And the jury did not hear any of the details concerning the criminal conduct that underlay the State's restricted person charge against Samora and never learned that he had prior felony convictions until the subsequent trial on the restricted-person charge. In a prior case, we determined that no prejudice was shown even where a jury was informed that a defendant was a restricted person. *See State v. Vu*, 2017 UT App 179, ¶ 17, 405 P.3d 879 (stating that "[w]hile learning of [the defendant's] restricted status without additional explanation could cause the jury to speculate as to the reason behind it, a mere possibility of speculation is not sufficient to demonstrate prejudice"). Here, where the jury was told only that Samora was charged with possession of a firearm by a restricted person—and not that he actually was a restricted person—the court's references are even less prejudicial.

CONCLUSION

¶38 The district court did not plainly err by declining to dismiss Samora's case on the ground that his right to a speedy trial was violated because, due to Samora's own actions delaying the proceedings, there was no error, let alone obvious error, in that regard. It follows that Trial Counsel could not have

provided ineffective assistance of counsel for not moving for dismissal on that basis because any such motion would have been futile. Finally, even assuming it was error to inform the jury pool of the restricted person charge, such error did not prejudice Samora.

¶39   Affirmed.

————