**2024 UT App 192**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
KESHAUN MYKEL PUENTE,
Appellant.

Opinion
No. 20220089-CA
Filed December 27, 2024

Second District Court, Ogden Department
The Honorable Jennifer L. Valencia
No. 181902630

Emily Adams, Freyja Johnson, Melissa Jo Townsend,
and Hannah Leavitt-Howell, Attorneys for Appellant

Sean D. Reyes and Hwa Sung Doucette,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN M. HARRIS and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1 In November 2018, the State charged Keshaun Mykel Puente with one count of murder and three counts of felony discharge of a firearm with serious bodily injury. Just over three years later, a jury convicted Puente on all four counts. Puente appeals his convictions, arguing that his constitutional right to a speedy trial was violated and that he received ineffective assistance of counsel. We reject these claims and affirm Puente's convictions.

BACKGROUND

¶2      In June 2018, a man was shot in a parking lot and later died of his wounds. On November 7, 2018, the State charged Puente with one count of murder and three counts of felony discharge of a firearm with serious bodily injury in connection with this death. It wasn't until January 2019 that Puente was located and arrested in Nevada and then extradited to Utah. On January 17, Puente made an initial appearance, was appointed a public defender, and invoked his speedy trial right. A subsequent hearing was scheduled for January 23 for the purpose of deciding whether to proceed with a preliminary hearing. The hearing set for January 23 was continued until January 30 at Puente's request. At the January 30 hearing, Puente's preliminary hearing was scheduled for February 28. But that hearing was continued by stipulation of all parties until April 4 due to a medical report being unavailable. The preliminary hearing was again continued until April 15 due to a conflict with the defense counsel's schedule.

¶3      On April 15, the preliminary hearing was held. At the commencement of that hearing, Puente asked to continue the matter again to allow him time to retain private counsel. The court denied that request and, at the conclusion of the hearing, found probable cause to bind Puente over for trial on all counts. Puente entered pleas of not guilty on all counts. The court scheduled a pretrial conference to select trial dates, but on May 13, the scheduled date for that conference, Puente refused transport to the courthouse. Again, on May 22, the new date for the conference, Puente refused transport.[1] On May 29, Puente

---

1. We acknowledge that Puente's lawyers later asserted that he did not refuse transport but rather, due to "some confusion," Puente was showering at the time of the conference and was unable to be transported from the jail to the courthouse. The relevant minute entries, however, reflect only that Puente refused

(continued…)

appeared, and the court scheduled a jury trial for November and a pretrial conference for August 14. At the August 14 conference, Puente moved to continue the matter to August 28 because he was considering retaining private counsel. At the August 28 conference, another pretrial conference was scheduled for October 2.

¶4     But on September 13, Puente filed a motion seeking the appointment and payment of an eyewitness identification expert. Puente expressly waived his right to a speedy trial to resolve this motion. In October, defense counsel indicated that the eyewitness expert would not be ready to proceed by the scheduled November trial date. Both the State and Puente also agreed that they would need to hold a hearing to address the admissibility of eyewitness identification testimony pursuant to rule 617 of the Utah Rules of Evidence.[2] That hearing was scheduled for November on the dates originally scheduled for trial. The hearing was then continued until January 23, 2020, due to the unavailability of a witness.

¶5     The day before the scheduled rule 617 hearing, Puente requested a continuance. The hearing was rescheduled for

---

transport. Where we have no finding or testimony establishing anything other than a refusal to be transported, we can rely only on the minute entries.

2. These types of hearings were originally held pursuant to *State v. Ramirez*, 817 P.2d 774, 780 (Utah 1991). However, in 2019, evidentiary rule 617, addressing the admissibility of eyewitness identification testimony, became effective. Soon after rule 617 became effective, the Utah Supreme Court abrogated *Ramirez*, clarifying that rule 617—not *Ramirez*—provided "the threshold basis for assessing the admissibility of the eyewitness identification testimony." *See State v. Lujan*, 2020 UT 5, ¶¶ 29–30, 459 P.3d 992.

February 20. After the conclusion of that hearing, the court held a pretrial conference, scheduled an additional pretrial conference for May, and scheduled a jury trial to begin on November 30.

¶6     But then the worldwide COVID-19 pandemic disrupted everything. On March 6, Utah's governor declared a state of emergency. Utah Exec. Order No. 2020-1 (Mar. 6, 2020). On March 21, the Utah Supreme Court suspended jury selection and jury trials until after June 1.[3] On May 1, the Utah Supreme Court suspended all criminal jury trials indefinitely.[4] Still, at the May pretrial conference, the parties confirmed the trial dates in November and December, with an optimistic assumption that by then, the suspension of jury trials would be lifted.

¶7     By October, it became clear that "an in-person trial could likely not be held for some time." The court offered Puente the option to have a trial held by videoconference, but he declined the offer. The court rescheduled the trial for April 2021. In March 2021, due to the persistence of the pandemic, the court vacated the April dates and scheduled another pretrial conference in May. On April 2, Puente filed a motion to dismiss on speedy trial grounds, which the district court denied.

---

3. *See* Administrative Order for Court Operations During Pandemic, Utah Supreme Court (Mar. 21, 2020), https://www.utcourts.gov/content/dam/alerts/docs/20200320%20-%20Pandemic%20Administrative%20Order.pdf [https://perma.cc/34W3-JXL9].

4. *See* Administrative Order for Court Operations During Pandemic, Utah Supreme Court (May 1, 2020), https://www.utcourts.gov/content/dam/alerts/docs/20200501%20-%20Pandemic%20Administrative%20Order.pdf [https://perma.cc/5USQ-CVWM].

¶8 Around the same time that the district court issued its denial of Puente's motion, pandemic restrictions were lifted and a new jury trial was scheduled for October, with backup dates beginning in November. In September, Puente asked to strike the October dates in favor of the November schedule. Puente's jury trial began on November 29 and concluded on December 6, 2021.

¶9 As relevant here, during closing arguments, the prosecutor stated that he had "been in [his] job for going on over 18 years" and had "[h]andled probably 75 different homicide cases." The prosecutor explained that throughout his career he had seen many different reasons that "people have killed people." He provided various examples of motives in other murder cases and argued that these motives didn't "seem like a good enough reason for somebody to kill another person," so "motive, although nice when you have it, isn't all it's cracked up to be." Defense counsel did not object to the prosecutor's discussion of these matters, nor did the defense address these remarks in its own closing arguments. The jury convicted Puente on all four counts.

## ISSUES AND STANDARDS OF REVIEW

¶10 Puente appeals, raising two issues. First, Puente asserts that the district court erred in denying his motion to dismiss on speedy trial grounds. Second, Puente claims that his counsel rendered ineffective assistance by failing to object to the prosecutor's remarks about experience and motive during closing argument.

¶11 "Whether the district court erred when it denied [a defendant's] motion to dismiss for violation of [the] right to a speedy trial is . . . a question of law reviewed for correctness." *State v. Younge*, 2013 UT 71, ¶ 10, 321 P.3d 1127. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective

assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (cleaned up).

ANALYSIS

## I. Speedy Trial Claim

¶12 "The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to a speedy and public trial." *State v. Thompson-Jacobson*, 2022 UT App 29, ¶ 9, 508 P.3d 604 (cleaned up). This is a "fundamental" right that "is imposed by the Due Process Clause of the Fourteenth Amendment on the States." *State v. Younge*, 2013 UT 71, ¶ 16, 321 P.3d 1127 (cleaned up).

¶13 The United States Supreme Court has established a four-factor test to evaluate a Sixth Amendment speedy trial claim. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). Under the *Barker* framework, we consider (A) the length of delay, (B) the reason for the delay, (C) the defendant's assertion of the right, and (D) whether the delay prejudiced the defendant. *Id.*

A. The Length of Delay

¶14 The first *Barker* factor is the length of delay. This factor presents "a double [i]nquiry." *See Doggett v. United States*, 505 U.S. 647, 651 (1992). First, we must ask whether the delay was long enough to trigger a full *Barker* analysis. Delays in excess of one year are usually deemed something longer than mere "ordinary" delay and thus long enough to trigger a *Barker* inquiry. *See id.* at 652 & n.1. The clock on this inquiry starts running when a defendant is charged with a crime and stops running when the trial commences. *See Barker*, 407 U.S. at 533; *State v. Samora*, 2022 UT App 7, ¶ 22, 504 P.3d 195, *cert. denied*, 525 P.3d 1254 (Utah 2022).

¶15    Here, Puente was charged on November 7, 2018, and his trial did not begin until November 29, 2021, three years later. This delay clearly exceeds one year and thus qualifies for a further *Barker* analysis.

¶16    The second part of this inquiry requires us to examine the "extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett*, 505 U.S. at 652. The extent of delay matters because "the presumption that pretrial delay has prejudiced the accused intensifies over time." *Id.*

¶17    Here, the delay of Puente's trial extended over three years. In our view, this factor of the analysis—at least on the surface—weighs in favor of Puente. But the length of delay is just one factor in the analysis, and it must be considered in context. As we have recently said, "the *reason* for the delay is much more important in a speedy trial analysis than a rote counting of the number of days of delay." *State v. Tuinman*, 2023 UT App 83, ¶ 58, 535 P.3d 362, *cert. denied*, 540 P.3d 79 (Utah 2023). Because, as discussed below, the reason for the delay cannot primarily be attributed to the State, we do not weigh this first factor heavily in Puente's favor.

B.    The Reason for the Delay

¶18    The second *Barker* factor compels us to consider the reason for delay. In conducting this analysis, we first decide whether each delay was attributable to the State or to the defendant. For every delay attributed to the State, we must determine whether it was deliberate, neutral, or valid. *See Thompson-Jacobson*, 2022 UT App 29, ¶¶ 12–13. As the Supreme Court clarified, different reasons carry different weights:

> A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be

weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker*, 407 U.S. at 531 (cleaned up).

¶19 We examined similar circumstances as those presented here in *State v. Tuinman*, 2023 UT App 83, 535 P.3d 362. There we held that any "pandemic-related delay should be considered justified, or at least considered neutral and weighed against neither side." *Id.* ¶ 63 (cleaned up). Thus, pandemic related delays in this case are not weighed against either side.

¶20 The first delay in this case was the 72 days it took for law enforcement to locate Puente in Nevada. Once he was arrested, there were 32 more days of delay caused by Puente's own motions or scheduling conflicts. An additional 35 days of delay were caused when Puente stipulated to a continuance related to the unavailable medical report. There were 16 days of delay caused by Puente's refusal of transport. And there were, in total, 208 days of delay during which Puente, for various reasons, expressly waived his right to a speedy trial. These delays account for 363 days, which are all attributable to Puente.

¶21 Puente argues in his brief that "a normal scheduling matter . . . should be attributed to neither side." In total, there are 313 days of normal scheduling delays which, under Puente's own reasoning, cannot be attributed to either side.

¶22 Finally, there are 443 days of delay that were caused by the COVID-19 pandemic. During this delay, the Utah Supreme Court constantly reevaluated the safety protocols in place and whether it would be reasonable for jury trials to continue. This delay is

attributed to the pandemic under *Tuinman* and thus weighs against neither side. *See id.*

¶23   In total, Puente was responsible for 363 days of the delay. Another 313 days of delay were caused by normal scheduling and thus are not attributable to either side under Puente's own reasoning. The remaining 443 days of delay were caused by the COVID-19 pandemic. This likewise does not weigh against either party. As this court recently held, "delays associated with a once-in-a-century worldwide pandemic should not in fairness be held against the State" but, instead, "should be considered justified, or at least considered neutral and weighed against neither side." *Id.* (cleaned up).

¶24   By this count, there are no delays attributable to the State. But even if we were to count the 313 days of normal scheduling delays against the State, "we detect absolutely no gamesmanship, tactical delay, or even negligence on the part of the State." *Id.* ¶ 61. Under such circumstances, those delays would be considered neutral. Given that almost an entire year of delay was attributable to Puente and that arguably none of the delay was caused by the State—certainly none that was malicious or tactical—this factor weighs against Puente.

C.   The Defendant's Assertion of the Right

¶25   Under the third *Barker* factor, we consider Puente's assertion of his right to a speedy trial. This analysis is not about whether the defendant used any magic words to assert the right but "whether the defendant's behavior during the course of litigation evinces a desire to go to trial." *See United States v. Koerber*, 10 F.4th 1083, 1110 (10th Cir. 2021) (cleaned up). This analysis should take into account the overall behavior of the defendant during the course of the litigation and whether that behavior manifests a "desire to go to trial with dispatch." *United States v. Batie*, 433 F.3d 1287, 1291 (10th Cir. 2006).

¶26 Here, Puente formally asserted his right to a speedy trial on January 17, 2019. Such a formal invocation of the speedy trial right weighs "strong[ly]" in a defendant's favor. *Barker*, 407 U.S. at 531–32. When the State initiated the process of introducing an eyewitness at trial, Puente waived his speedy trial right to resolve that concern. But as soon as that was resolved, Puente sought new trial dates and clarified on the record that despite any incidental delays in scheduling, he was "not waiving any speedy trial provisions." Later, at the May 2020 pretrial conference, the court recognized that Puente had asserted "his speedy trial rights," and defense counsel affirmed that Puente was not prepared to waive his speedy trial rights. Puente even spoke up in court to address his "speedy trial rights" before being told by the court to discuss it with his attorney rather than putting it on the record. After Puente raised the issue twice more, the court responded that it had "made note of the fact that" he was "not waiving [his] speedy trial rights." Finally, Puente formally moved to dismiss the case on the basis of a speedy trial violation in April 2021.

¶27 But the invocation analysis is not simply an inquiry of how many times the defendant said the words "speedy trial" on the record. It is an assessment of his actions. In this sense, this analysis is caught up with the second *Barker* factor—the reason for delay—because if it was the defendant that was delaying the trial, he was by definition not invoking his right.

¶28 Here, Puente began this entire process by leaving the jurisdiction. Once he was arrested and extradited, Puente moved to continue his initial hearings twice in the course of just a couple of months. Twice when he was supposed to be at a pretrial conference, Puente refused transport. Puente later moved for a continuance multiple times so he could seek private counsel. Puente then waived his right to a speedy trial while his motion to appoint an eyewitness identification expert was pending. After all the COVID-19 pandemic delays, Puente again waived his right in order to push his trial date to November.

¶29 Given all that Puente did to delay his trial, this factor is neutral at best.

D.    Prejudice

¶30 Lastly, the fourth *Barker* factor requires an analysis of whether the defendant was prejudiced by the delay. Generally, courts consider three types of harm typical of delays in the prosecution of criminal cases. These include "oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the accused's defense will be impaired." *Doggett*, 505 U.S. at 654 (cleaned up). Of the three, the last is the "most serious." *Barker*, 407 U.S. at 532.

¶31 Here, we agree with the district court that Puente "suffered some prejudice." Puente undoubtedly experienced anxiety and concern as he waited over three years for his day in court. On top of that, he spent his pretrial detention in the Weber County Jail, which was a hotspot for COVID-19 during the final year of his incarceration.[5] Puente's inability to interact with or provide for his two children was also undoubtedly difficult. Thus, Puente suffered some of the first two types of prejudice by the nature of his incarceration. However, he did not claim any harm to his ability to defend himself at trial, the third and weightiest form of prejudice. Under these circumstances, we recognize that Puente suffered some prejudice, but because the delay did not affect his ability to defend himself at trial, we conclude that this factor weighs only slightly in his favor.

¶32 In conclusion, "none of the four factors identified above" constitute "either a necessary or sufficient condition to the finding

---

5. *See* Mark Shenefelt, *As Utah COVID-19 Cases Increase, Weber County Jail Has a New Outbreak*, Standard-Examiner (July 28, 2021), https://www.standard.net/police-fire/2021/jul/28/as-utah-COVID-cases-increase-weber-county-jail-has-a-new-outbreak [https://perma.cc/5EFH-AMMF].

of a deprivation of the right of speedy trial." *Id.* at 533. "Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Id.* Because the four *Barker* factors either weigh against Puente or only slightly in his favor, the district court did not err by concluding that Puente's right to a speedy trial had not been violated. We therefore affirm the court's denial of Puente's motion to dismiss on these grounds.

## II. Ineffective Assistance of Counsel Claim

¶33 Next, Puente asserts that he received ineffective assistance when his counsel failed to object to the prosecutor's comments about motive. To succeed on a claim of ineffective assistance of counsel, Puente must make a two-part showing: (1) that counsel's performance was deficient in that it "fell below an objective standard of reasonableness" and (2) that this deficient performance "prejudiced the defense" such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687. Thus, "if either is lacking, the claim fails and this court need not address the other." *State v. Kufrin*, 2024 UT App 86, ¶ 55, 551 P.3d 416 (cleaned up). Though we need not address both prongs, Puente cannot make the required showing on either.

¶34 First, we address prejudice. Here, it is very difficult for Puente to demonstrate prejudice when the alleged prosecutorial misconduct consisted of the prosecutor's discussion of motive—something that is *not* an element of the charged crimes. The alleged prosecutorial misconduct occurred when the prosecutor discussed the concept that generally no motive will seem like a

good enough reason to kill someone. The prosecutor suggested that being able to prove motive isn't always that helpful and that therefore the jury should not have been disturbed by the prosecution's relative lack of motive evidence. In his briefing, Puente asserts that the "State did not prove [Puente] had a motive to kill [the victim]." But the State did not have to prove that Puente had a motive to kill the victim. After all, "motive is not a necessary element in the offense of homicide and proof of motive does not establish guilt nor does absence of motive prove innocence." *In re Contempt of Peterson*, 386 P.2d 726, 727 (Utah 1963).

¶35 And it's not as if this was a secret to anyone in the courtroom. In the jury instructions, the judge clarified that "[m]otive is not an element of the crimes charged in this case." And in the jury instructions laying out the elements of the charged crimes, nothing the judge said made it seem as though the prosecution's ability or inability to prove Puente's motive should impact a determination of his guilt.

¶36 Given that motive is not an element of the crimes for which Puente was charged and the judge made clear to the jury that motive was not an element, it's difficult to see how Puente would have been prejudiced by the prosecutor's commentary on the lack of a motive. When we imagine a trial in which the prosecutor did not make these comments, we see no reasonable probability that the outcome would have differed from what it was here.

¶37 Second, even if Puente could demonstrate some prejudice, he cannot demonstrate that his counsel's performance "fell below an objective standard of reasonableness." *State v. Scott*, 2020 UT 13, ¶ 31, 462 P.3d 350 (cleaned up). "If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871. Here, perhaps counsel could have objected to the prosecutor's closing statements, but that does not mean that counsel *must* do that. *See*

*State v. Hart*, 2020 UT App 25, ¶ 29, 460 P.3d 604 ("[J]ust because counsel *can* make an objection does not mean counsel *must* make an objection to avoid rendering ineffective assistance. Legal objections are an inherently strategic business."). Here, reasonable counsel could have believed that the prosecutor's statements were at least as helpful to Puente's defense as they were harmful, because they served to highlight the State's lack of evidence regarding motive. On this basis, reasonable counsel could have forgone an objection for strategic purposes. *See Ray*, 2020 UT 12, ¶ 34 (stating that counsel's reasonable strategy forecloses a conclusion of deficient performance).

¶38    Puente's counsel could have been employing a reasonable trial strategy when he declined to object to alleged prosecutorial misconduct and the absence of this objection did not prejudice Puente. Thus, Puente has failed to meet his burden to demonstrate ineffective assistance of counsel.

## CONCLUSION

¶39    Because Puente did not suffer a violation of his right to a speedy trial and because his counsel did not provide ineffective assistance, we reject Puente's arguments and affirm his convictions.

---