2023 UT App 46

# THE UTAH COURT OF APPEALS

COREY BRINDLEY,
Petitioner,

*v.*

LOGAN CITY AND LOGAN CITY EMPLOYEE APPEALS BOARD,
Respondents.

Opinion
No. 20220187-CA
Filed May 4, 2023

Original Proceeding in this Court

Josh Chambers and J. Brett Chambers,
Attorneys for Petitioner

Craig Carlston, Kymber Housley, and Mohamed I.
Abdullahi, Attorneys for Respondents

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

MORTENSEN, Judge:

¶1 Corey Brindley was fired by Logan City (Logan) after random testing revealed alcohol in his system for the second time in three years. Brindley appealed his termination to the Logan City Employee Appeals Board (the Board), which held a hearing. Logan provided the Board with evidence from the technician (Technician) who administered the breathalyzer test. This evidence consisted of (1) an emailed statement purportedly written by Technician but sent from his supervisor's email account and (2) a form containing Technician's certification from the time of administration that the test was performed according to standard procedure and his handwritten report of the test results. But Technician was not present at the hearing, and Logan offered no other evidence as to the correctness of the test's administration. In fact, there was evidence presented calling the

reliability of the test administration into question. Because Brindley had a statutory right to confront the witnesses whose testimonies the Board considered, and because the Board considered a statement and a certification ascribed to Technician despite Technician's absence, we conclude that the Board exceeded its discretion in upholding Brindley's termination. Accordingly, we set aside the Board's decision.

## BACKGROUND

¶2 Brindley was employed as a wastewater inspector for Logan. Brindley's position required a commercial driver license (CDL) and was classified as a safety-sensitive position. All personnel in such positions are subject to random drug and alcohol testing under section 15-02(2) of the Logan Employee Handbook (the Handbook).[1] *See* Logan City Employee Handbook § 15-02(2) (revised Nov. 2009).[2]

---

1. This complies with requirements imposed by the United States Department of Transportation (DOT) for random drug and alcohol testing of CDL licensees and employees in safety-sensitive positions. *See* 49 C.F.R. § 382.305 (2021). While DOT forms and procedures are referred to in the record and in this opinion, the issue before us relies on Logan's policies, not DOT policies, because the positive screen in question was below the threshold for DOT action. *See id.* § 40.23(c) ("[A]n employer who receives an alcohol test result of 0.04 or higher . . . must immediately remove the employee involved from performing safety-sensitive functions. If [the employer] receive[s] an alcohol test result of 0.02–0.039, [it] must temporarily remove the employee involved from performing safety-sensitive functions . . . .").

2. This section and others in the Handbook have been revised since the events at issue. *See* Logan City Employee

(continued…)

¶3      In December 2018, Brindley was selected for random drug and alcohol screening at work, and his breathalyzer test result—uncontested here—indicated a blood alcohol content (BAC) of .029. He was sent home but was allowed to return to work on a later day, as was consistent with existing policy for a first-time positive result. *See id.*

¶4      On December 9, 2021, Brindley was again selected for random drug and alcohol testing. He began work at 7:00 a.m. that day. He reported to Sterling Urgent Care—Logan's third-party provider for random drug and alcohol testing—when directed. Technician performed a breathalyzer test and wrote the results as allegedly indicating a BAC of .017 with a reading time of 9:45 a.m. Some ten or eleven minutes later,[3] Technician performed a confirmation test and wrote an alleged result of .014. Technician was not able to print the results, purportedly because the printer was not working. But Technician completed the DOT Alcohol Testing Form, which included the following certification: "I certify that I have conducted alcohol testing on the above named individual in accordance with the procedures established in the US Department of Transportation regulation, 49 CFR Part 40, that I am qualified to operate the testing device(s) identified, and that the results are as recorded." Technician checked the box indicating that he was a blood alcohol technician, wrote in the results, and signed and dated the form. A report was printed the

---

Handbook § 15-02(3)-(4) (revised Feb. 2022), https://cms9files.re vize.com/loganut/document_center/Employee%20Handbook/S ECTION%2015%20Substance%20Abuse%20and%20Drug%20Te sting%20-%20February%202022.pdf [https://perma.cc/K9CR-D6 SG]. Unless otherwise indicated, we refer to the version of the Handbook in effect at the time of Brindley's termination.

3. Technician stated that he performed the confirmation test ten minutes after the first, but Technician's supervisor testified that it was eleven minutes later, presumably based on the machine's recalled results.

next day for Logan's Safety Officer (Safety Officer), showing a BAC of .017.

¶5 The Handbook specifies that "[a]n employee who has tested positive on a drug test and is allowed to return to work and who receives a positive result on any subsequent drug test will be terminated." Logan City Employee Handbook § 15-02(2)(b) (revised Nov. 2009).[4] On December 14, 2021, a "Notice of Termination of Employment" was sent to Brindley, stating,

> On December 9, 2021 you took a random drug and alcohol screening. This screening resulted in a BAC of 0.017. Due to the timing of the screening, it is clear that you were under the influence of alcohol while at work.[5]

---

4. The Handbook has been revised to state that "[a]ny employee who has tested positive *for any measurable amount on an alcohol or drug test* will be subject to discipline, up to and including termination" and that "[a]n employee who has tested positive *for any measurable amount on an alcohol or drug test* and is allowed to return to work and who receives a positive result on any subsequent alcohol or drug test within five years of the first positive test will be terminated." *See id.* (emphasis added). Brindley argues that "tested positive"—without the updated language—is vague and unenforceable. Because we resolve this case on other grounds, we need not address this issue.

5. Logan's use of "under the influence" is curious because Logan does not define this term, *see* Logan City Employee Handbook § 15-01(1) (revised Nov. 2009), and Brindley's alleged BAC of .017 falls well under Utah's nationally low statutory definition for "under the influence" as a BAC of .05, *see* Utah Code § 41-6a-502(1)(a), and—as previously noted—also under DOT's action threshold, *see* 49 C.F.R. § 40.23(c) (2023).

> . . . .
>
> Also, in December 2018 you had an additional positive alcohol screening and you were allowed to continue employment.
>
> . . . .
>
> Due to your positive tests for alcohol on the above date(s), we have determined it is the best solution to terminate your employment with Logan . . . .

Two days later, Brindley appealed his termination. The Handbook indicates that in an appeal, "[t]he burden of proof is on the employee to prove, by a preponderance of the evidence, that disciplinary measures were not in accordance with established policy." Logan City Employee Handbook § 8-03(5) (revised April 2018), https://cms9files.revize.com/loganut/departments/hr/SECTION%208%20Grievances%20-%20November%202009%20Final.pdf [https://perma.cc/G3A9-MKY6].[6]

---

6. We acknowledge that there are potential due process issues with foisting the burden of proof on a municipal employee like Brindley in such a hearing. As Brindley highlights, qualifying municipal employees have a recognized property interest in their jobs. *See* Utah Code § 10-3-1105(1)(a); *Becker v. Sunset City*, 2009 UT App 197, ¶ 6, 216 P.3d 367 ("[Employees have] a recognized property right in [their] job[s]. . . . Accordingly, [the employer] was required to follow adequate due process procedures in connection with its termination of . . . employment."), *aff'd*, 2013 UT 51, 309 P.3d 223; *Lucas v. Murray City Civil Service Comm'n*, 949 P.2d 746, 752 (Utah Ct. App. 1997) ("If a property interest in continued employment exists, then the employee is entitled to

(continued…)

¶6 The next month, the Board held a hearing to consider Brindley's appeal. At the hearing, the Board first heard testimony from Safety Officer. Safety Officer testified about Logan's procedures for random employee drug and alcohol tests. Safety Officer also testified about Brindley's prior tests, indicating that in December 2018, Brindley was tested around 7:00 a.m. and "blew a .032," which "hit the action level for DOT at .02," meaning that the employee has to "complete a confirmation test" after "they wait 15 minutes and no longer than 30 minutes." Safety Officer indicated that "[t]he second test is the one that actually gets reported to the DOT and Logan" and that for Brindley, "[a] second test was given, and it was .029 and . . . was reported to the DOT" and to Logan's human resource department. At that time, Brindley "was sent home because under DOT regulations they say that an individual that is above a .02 has to be removed from their safety sensitive position for at least 24 hours and then upon their return they have to produce a negative test," which—according to Logan's then-unwritten policy—meant "zero" alcohol in the blood.

¶7 Brindley's counsel inquired into Logan's policy of interpreting a "positive result" as any measurable amount of alcohol, and Safety Officer acknowledged that the term "positive" was not defined in the Handbook and explained that the "no tolerance" policy was "just something that we have always gone with." Safety Officer admitted, though, that this was Logan's first experience with "a positive," having "always had zeros" previously. Brindley's counsel stated that he was "trying to figure out where the zero came from" because "there is nothing in the DOT and nothing in the Logan City Code that specifies that anything between zero and .02 would be a positive result. There

_____

procedures comporting with the minimum requirements of due process, as provided in the Constitution."). These are weighty questions we need not answer here, but we note that we are dubious of Logan's ability to place this burden on the employee.

is nothing in the Logan City Code that specifies this at all." Safety Officer agreed, saying, "No, nothing."

¶8 The Board next heard testimony from Technician's supervisor (Supervisor), the Occupational Director of Sterling Urgent Care, who joined via Zoom. Technician was not present—either virtually or in person—to testify. According to the minutes of the meeting, Logan's counsel said that "this is not ideal and [Logan] would have liked to have the person attend [the] hearing in person who administered the test to Mr. Brindley . . . . Unfortunately, this body does not have subpoena powers so we could not force [Technician] to attend."[7] Instead, Logan indicated that it had "a substitute," who was Supervisor.

¶9 Logan further indicated that it had received a statement from Technician in the form of an email and that it wanted Supervisor to read the statement to the Board. The email said it was "[Technician's] statement," but it was sent from Supervisor's email address to Safety Officer. Brindley's counsel "objected on the basis [that] this is hearsay and an out of court statement being taken [for] the truth of the matter" asserted. Brindley's counsel further argued that under Utah law, "the employee has the right to have the witness whose testimony is being offered against him actually in court." *See* Utah Code § 10-3-1106(4)(a)(iii) ("An employee who is the subject of the discharge, suspension, or transfer may . . . confront the witness whose testimony is to be considered . . . .").[8] The

---

7. This quotation and those that follow are taken from the minutes of the hearing because a transcript of the hearing is not included in the record. Accordingly, we are aware that the minutes likely do not capture all questions and testimony verbatim. But we are satisfied that this reality does not affect our decision.

8. This provision applies to all "employee[s] to which [s]ection 10-3-1105 applies," Utah Code § 10-3-1106(1), which includes municipal employees with some exceptions, *id.* § 10-3-1105.

(continued…)

Handbook, too, states that "[t]he employee shall be entitled to . . . confront the witnesses whose testimony is to be considered." Logan City Employee Handbook § 8-03(1) (revised April 2018), https://cms9files.revize.com/loganut/departments/hr/SECTION %208%20Grievances%20-%20November%202009%20Final.pdf [https://perma.cc/G3A9-MKY6]. Accordingly, Brindley's counsel "objected to this statement being introduced." But the Board—empowered by the Handbook to "determine[] the admissibility of evidence and its use" and "not [being] bound by the rules of evidence" but being able to "hear any evidence it determine[d] relevant to the matter," *see id.* § 8-03(2)—permitted Supervisor to read and provide copies of the following statement purportedly provided by Technician:

> I tested Corey Brindley for a DOT breath alcohol and a DOT drug screen test on December 9, 2021. The machine was activated at 9:34 [a.m.] for test 714. The result was .017 with a reading time of [9:35 a.m.]. . . . [A]fter attempting to print out a copy of the previous test, ten minutes had passed by before performing a second breath alcohol test. Due to the result being lower than the DOT limit of .02 the patient was released.

¶10 Supervisor testified about the machine, providing its model information and declaring that "[i]t was not the handheld breath alcohol machine itself that was having issues" but "just the printer on the machine." She stated that "[Technician] is a newer employee" and that after he brought to her attention the failure to print the test receipts, they performed "a memory recall" to "pull up the results." She further testified that the machine had been calibrated the day before Brindley's test, and she asserted that there was no "reason to doubt the accuracy of the test results." But she also testified that she "did not perform the test." Brindley's counsel asked, "Because you did not administer the test yourself,

Brindley's former position does not fall under any of the exceptions. *See id.*

you don't know if the test was actually performed correctly?" Supervisor responded, "I was not there but [Technician] has gone through the training and the machine pretty much does the test for you." She confirmed that Technician administered Brindley's second test "at 11 minutes versus 15 minutes" after the first test—referring to the timeframe for a confirmation test required by DOT when an initial test is above .02—but stated that "had it been 15 minutes versus 11 minutes there really would not have been a big difference."

¶11 Brindley's counsel asked Supervisor, "What are some of the errors that can occur if the test is not administered correctly?" Supervisor responded, "You can get inaccurate results such as someone that has gum in their mouth, chew in their mouth at the time of the test." She also stated that "foods and drinks and even if the person if they were to belch too much can sometimes alter the results of a test" and "that is why they get the opportunity to take the confirmation test."

¶12 The Board next heard from a lieutenant with the Logan City Police Department (Lieutenant). Lieutenant testified that the average alcohol burn-off rate for adults is .015 grams of alcohol per hour. He then estimated that Brindley's BAC would have been "somewhere around a .045" at 7:00 a.m. when he began working that day based on a BAC of .017 at 9:35 a.m. Brindley's counsel asked if it was "true that certain foods can interfere with the accuracy of the test," and Lieutenant responded, "Yes." Brindley's counsel then asked if that was why it was "important that the test be administered correctly," and Lieutenant again responded, "Yes."

¶13 Finally, the Board heard testimony from Brindley. He testified that he stopped drinking alcohol before he went to bed the previous night at 9:00 p.m. He further testified that he uses chewing tobacco every day and that he was chewing tobacco on the morning of December 9, 2021, until "[r]ight before [he] walked through the door" to be tested. Logan's counsel asked, "Isn't it true that you didn't tell [Technician] who administered the test that you had chewing tobacco in your mouth?" and Brindley

responded, "He never asked." Brindley's counsel—not Brindley himself—indicated that Brindley removed the chewing tobacco between ten and fifteen minutes before the first test was administered. Brindley stated that Technician did not tell him to remove the chewing tobacco. Logan's counsel asked, "Did they inspect your mouth at all?" Brindley responded, "No, they did not." Logan's counsel repeated the question: "So, you are saying that before they gave that first test, they did not have you open your mouth and see if you had anything in it?" And again Brindley stated, "No, they did not."

¶14 At this point in the hearing, the Board indicated that it would have liked to ask Supervisor—who had left the hearing—to address procedures and implications related to chewing tobacco and breathalyzer tests. Logan's counsel asked Safety Officer to see if Supervisor was able to rejoin the hearing via Zoom, stating that "the troubling thing" about the situation is not knowing whether the presence of chewing tobacco would impact the test results a little or could result in a false positive. Brindley's counsel indicated that he felt Technician was a key witness because there was no evidence of whether Technician asked Brindley about chewing tobacco or whether the test was performed correctly. Logan's counsel "agreed and said this is very frustrating to him" that Technician was not present to testify. He noted that "there is no disputing" that technicians administering breathalyzer tests "are required to check the mouth and are required to make sure [test subjects] don't have anything" in there but that Technician was not present to testify as to whether he did so. Logan's counsel indicated that the Board had the right to continue the hearing to try to secure Technician's presence or that it could make a decision based on the evidence it had received. Brindley's counsel expressed his concern related to continuing the hearing that Brindley had already been out of work for over a month awaiting the hearing. The Board members discussed whether they should try to secure Technician's presence, and one stated that he expected that Supervisor could have information related to chewing tobacco.

¶15 Supervisor then rejoined the hearing via Zoom. She testified that by fifteen minutes after removing chewing tobacco, the impact on the test results would be zero. When asked what the impact would be if chewing tobacco was removed five minutes before a test, Supervisor responded, "Where confirmation results were still given 11 minutes after the first test[,] the chewing tobacco should have dissipated to where it would not have affected the test." Then Brindley's counsel asked whether test results would be affected if chewing tobacco juices were still in the mouth, to which Supervisor responded, "Yes, it could. How much it could affect the results would be a question for a medical review officer in regard to the scientific levels." But she indicated that "[i]n her 17 years" in the field "she has never had that happen." And she stated, "Had [Brindley] had chewing tobacco in his mouth, and he removed [it] 10 minutes prior to the first test, and they did the confirmation test 10 minutes later[,] it would have been gone. It would not have affected the test." The Board then adjourned the hearing.

¶16 Later that day, the Board filed a brief two-sentence decision, indicating that it "voted by ballot to uphold the decision" to terminate Brindley because it "determined that [Logan] did follow its policies and procedures properly in terminating" him. But it made no findings or conclusions in support of its decision.

¶17 The Utah Code indicates that "[a] final action or order of the appeal board . . . may be reviewed by the Court of Appeals by filing with that court a petition for review." Utah Code § 10-3-1106(6)(a). Brindley now petitions us to review the Board's decision.


ISSUES AND STANDARDS OF REVIEW

¶18 Brindley raises five issues on appeal. First, Brindley argues that the Board violated his statutory and constitutional due process right to confront Technician. Next, he argues that the Board abused its discretion and exceeded its authority in three

respects: by speculating that Brindley's BAC was .017 given that the Board did not have testimony from Technician that the tests were performed correctly, by enforcing Logan's policy that a "positive result" means any measurable amount of alcohol, and by upholding his termination despite uncontroverted evidence that Brindley had been chewing tobacco before the test and that doing so could affect the reliability of the test results. Finally, he argues that the Board failed to make adequate findings of fact, rendering its decision arbitrary and capricious.

¶19 The applicable statute indicates that we perform our review "on the record of the appeal board" and "for the purpose of determining if the appeal board . . . abused its discretion or exceeded its authority." Utah Code § 10-3-1106(6)(c)(i)–(ii). "Generally, our review of administrative agency decisions is limited to determining whether the agency abused its discretion or exceeded its authority. But when the agency's decision implicates due process, we review it for correctness." *Palmer v. St. George City Council*, 2018 UT App 94, ¶ 11, 427 P.3d 423 (cleaned up), *cert. denied*, 432 P.3d 1231 (Utah 2018).

ANALYSIS

¶20 Brindley had a clear statutory right to confront the witnesses testifying against him, and the Board did not observe this right.[9] Accordingly, we conclude that the Board exceeded its

---

9. We need not consider Brindley's argument that he had a constitutional due process right to confront witnesses because we are satisfied that he had a statutory right to do so and that this right was not observed.

discretion, and we set aside the Board's decision upholding Brindley's termination.[10]

¶21    The Utah Code is clear that a municipal "employee who is the subject of . . . discharge, suspension, or transfer may . . . confront the witness whose testimony is to be considered." Utah Code § 10-3-1106(4)(iii). This right is also indicated by the Handbook: "The employee shall be entitled to . . . confront the witnesses whose testimony is to be considered." Logan City Employee Handbook § 8-03(1) (revised April 2018).[11] Accordingly, Brindley had a right to confront the witnesses whose testimonies were considered by the Board.

¶22    "It is well settled that when faced with a question of statutory interpretation, our primary goal is to evince the true intent and purpose of the legislature. The best evidence of the legislature's intent is the plain language of the statute itself. . . . When the meaning of a statute can be discerned from its language, no other interpretive tools are needed." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶¶ 14–15, 267 P.3d 863 (cleaned up). The plain language of Utah Code section 10-3-1106(4)(iii) is that a qualifying employee has a right to stand "face-to-face" with and to cross-examine any adverse witnesses whose testimony the Board considers. *See, e.g., State v. Isom*, 2015 UT App 160, ¶ 48, 354

---

10. Because we set aside the Board's decision on this ground, we need not address the remainder of Brindley's issues presented.

11. Brindley does not argue, and we do not decide, that the Handbook created a contractual right to confront witnesses. However, the Board voted to uphold Logan's decision to terminate Brindley because it "determined that [Logan] did follow its policies and procedures properly in terminating" Brindley. The ability to confront witnesses was among Logan's policies and procedures and was not followed.

P.3d 791, *cert. denied*, 364 P.3d 48 (Utah 2015);[12] *see also Confront*, Black's Law Dictionary (11th ed. 2019). Where there was no other opportunity for Brindley to face adverse witnesses, this can only mean that Brindley had a right to face adverse witnesses at the Board's hearing and cross-examine them there.

¶23   The Board heard testimony against Brindley from Safety Officer, Supervisor, and Lieutenant, and Brindley was able to question each of these individuals. However, Technician, who administered the tests, was not present at the hearing. Counsel for both parties indicated that Technician's absence was problematic, and the Board also expressed frustration with Technician's

---

12. We readily acknowledge that "the Sixth Amendment right to confront witnesses . . . pertains only to criminal prosecutions." *State v. One 1980 Cadillac*, 2001 UT 26, ¶ 14, 21 P.3d 212; *see also Iota LLC v. Davco Mgmt. Co. LC*, 2016 UT App 231, ¶ 66 n.17, 391 P.3d 239. Accordingly, we do not apply this right—as deriving from the Sixth Amendment—here. However, we think it implausible that in using the phrase "confront the witness," the legislature did not also intend to secure the opportunity to cross-examine each adverse witness face-to-face at the Board's hearing, given that the common usage of "confront" related to witnesses undeniably expresses the opportunity to cross-examine them in person. *See Envirocare of Utah v. Utah State Tax Comm'n*, 2009 UT 1, ¶ 5, 201 P.3d 982 ("When a term is not defined by statute, we look to its common usage to define it."); *see, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 68 (2004) ("Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."); *State v. Kendrick*, 538 P.2d 313, 315 (Utah 1975) ("The problem has been before the United States Supreme Court wherein the rule has been laid down that the right of . . . defendant[s] to confront the witnesses against [them] is a fundamental right and is essential to a fair trial. Right of confrontation is based upon the notion that [those] accused should have an opportunity to cross-examine the witnesses against [them].").

absence. However, the Board admitted a statement attributed to Technician despite Technician not being present and available for cross-examination. And the Board accepted the testing form containing Technician's certification and handwritten results. Because the Board did not permit Brindley to "confront the witness whose testimony [was] . . . considered," *see* Utah Code § 10-3-1106(4)(a)(iii), we set aside the Board's decision.

¶24   We are convinced that the Board not only considered Technician's testimony but also relied on it in reaching its decision. While the Board did not explicitly state that its decision relied on Technician's statement or certification,[13] Logan provided no evidence indicating that Brindley had any alcohol in his system beyond the test results, so the Board must have relied on the test results. And the only evidence available to the Board that the tests were administered properly was the certification that Technician

---

13. The Board did not provide any specific findings or conclusions related to its decision. We have stated that "without any findings of fact, or even a discussion on the record to support a decision, this court cannot perform its duty of reviewing the agency's decision in accordance with established legal principles and of protecting the parties and the public from arbitrary and capricious administrative action." *Palmer v. St. George City Council*, 2018 UT App 94, ¶ 38, 427 P.3d 423 (cleaned up), *cert. denied*, 432 P.3d 1231 (Utah 2018). Indeed, "the failure of an agency to make adequate findings of fact on material issues renders its findings arbitrary and capricious unless the evidence is clear, uncontroverted and capable of only one conclusion." *Id.* ¶ 13 (cleaned up); *see also Northern Monticello All. LLC v. San Juan County*, 2023 UT App 18, ¶ 1, 526 P.3d 829 ("[The Planning Commission] failed to produce written findings sufficient for appellate review, so its decision was unsupported by substantial evidence and was, therefore, arbitrary and capricious."). Although we need not rest our decision on this ground, a significant question exists as to whether we would be required to set aside the Board's decision on this basis alone.

completed on the testing form. Supervisor testified that the machine was calibrated correctly, but she also testified that there can be "inaccurate results" if the tests are not administered correctly. So to accept the test results as accurate and thereby uphold Brindley's termination, the Board must have believed Technician's testimony that the tests were administered accurately. But the record supports the conclusion that Brindley had chewing tobacco or its juices in his mouth at or soon before testing and that such a condition could invalidate the test. And even Technician's purported statements do not verify that he checked Brindley's mouth before testing, as Brindley testified Technician failed to do. For these reasons, we are not convinced that the test was administered reliably or, accordingly, that the Board could have rightly determined that in terminating Brindley, Logan abided by its policies and procedures.

¶25 But even if the Board somehow reached its conclusion without relying on Technician's testimony, it erred by not enforcing Brindley's statutory right and Logan's Handbook policy when denying Brindley the ability to confront Technician even though the Board considered Technician's testimony.[14]

---

14. Logan argues that "Brindley waived his right to confront" Technician "because he did not attempt to secure [Technician's] presence and when offered a continuance to do so, failed to accept the continuance." We disagree that Brindley was offered a continuance and failed to accept it. The hearing minutes indicate that Logan's counsel stated that the Board could choose to continue the hearing to seek Technician's presence; they do not indicate that Brindley was informed that he could continue the hearing and chose not to do so. Brindley's counsel's comment about Brindley being unemployed for over a month while awaiting the hearing was not a denial of an offer for a continuance. Accordingly, we do not accept Logan's argument that Brindley waived his right to confront the witness in this way.

(continued…)

CONCLUSION

¶26 Brindley had a right to confront witnesses whose testimony was to be considered—a right that was guaranteed by statute and listed in Logan's policies outlined in the Handbook. Because Logan offered testimonial evidence from Technician and Brindley was not able to confront Technician, the Board exceeded its discretion in upholding Brindley's termination. Accordingly, we set aside the Board's decision and direct the Board to conduct such further proceedings as might be appropriate, including perhaps a new hearing.

––––––––––

Additionally, Logan argues that Brindley waived this right by not attempting to secure Technician's attendance. Logan reasons that Brindley bore the burden of proof upon appeal to show that his termination was not in accordance with established policy, *see* Logan City Employee Handbook § 8-03(5) (revised April 2018), and that he also bore the burden of producing Technician. Logan fails, however, to provide any support whatsoever for this position. Accordingly, we conclude that this issue is inadequately briefed because Logan "has completely shifted the burden of researching . . . applicable law to the court" on this point. *See Jacob v. Cross*, 2012 UT App 190, ¶ 3, 283 P.3d 539 (per curiam). More importantly, even if Brindley bore the burden of proof upon appeal, this fact would not negate his statutory right to confront adverse witnesses at his hearing.