**2025 UT App 192**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
RYAN LYNN MCMANIGAL,
Appellant.

Opinion
No. 20230917-CA
Filed December 26, 2025

Third District Court, Salt Lake Department
The Honorable Matthew Bates
No. 201908298

Bradley J. Henderson and Stephen W. Howard,
Attorneys for Appellant

Derek E. Brown and Ginger Jarvis,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES RYAN M. HARRIS and JOHN D. LUTHY concurred.

ORME, Judge:

¶1 Following an intense standoff with police, Ryan Lynn McManigal was arrested and charged with, in relevant part, 9 counts of possession of a weapon of mass destruction (WMD). A jury convicted him on 6 of those counts. McManigal challenges those convictions, arguing that the trial court erred in denying his motion for a directed verdict and that the alleged failure to adequately define a WMD for the jury constituted plain error and ineffective assistance of counsel. We disagree and affirm his convictions.

## BACKGROUND[1]

### *The Events Leading to Arrest*

¶2     In July 2020, the manager of a South Jordan restaurant—located across the street from McManigal's residence—alerted police to text messages McManigal intended for him but which were mistakenly sent to a manager of a different location of the same restaurant chain. In those messages, McManigal threatened to shoot or harm those inside the South Jordan restaurant. When police officers subsequently knocked on McManigal's door to issue a trespass notice, they conversed with McManigal for about 10 minutes through a small opening in his front door. McManigal told the officers that the restaurant employees and certain South Jordan police officers were intentionally "antagonizing" him with their headlights "to drive him crazy." He also stated that some South Jordan police officers were colluding with a judge "to go after his inheritance" and that they "were using drones and other means to stalk him." McManigal then directed the officers at his door to visit his Facebook page where he said he would post "all of the evidence" supporting his claims. McManigal refused to sign the trespass notice but indicated that he understood that he was not allowed onto the restaurant property.

¶3     Following this interaction, one of the officers (Officer) visited McManigal's public Facebook page. He found a comment made by McManigal stating, "I feel much better after shooting out the streetlight last night." A check of the area confirmed that there was a broken streetlight "just on the corner of" the restaurant property. McManigal's Facebook page also contained comments referencing mass shootings and being "armed to the teeth." In one comment, McManigal stated, "It's looking like I might be getting

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Amboh*, 2023 UT App 150, n.1, 541 P.3d 299 (quotation simplified).

into a confrontation tonight because I'd rather die than live my life on my knees."

¶4    Because, in Officer's assessment, McManigal's online activity strongly suggested the presence of "some type of mental health ideology crisis," Officer arranged for a crisis outreach team to call McManigal to perform an assessment. During the phone call, which was recorded and lasted roughly 10 minutes, McManigal made statements mirroring those on his Facebook page. Among other things, he claimed he was being "gang stalked by" the restaurant's employees and that "a network" was targeting him to deprive him of his inheritance. He mentioned that his house was "completely fortified" and that he was "heavily armed." He further stated that he did not "want to die" but he also did not "want to live in a world that's so corrupt" and that if he had to, he would let anyone who came after him "have it" and "take a few out on [his] way."

¶5    Because McManigal's sister and aunt each had an active protective order against McManigal prohibiting him from possessing "guns or other weapons," this conversation was sufficient for law enforcement to obtain a warrant to search his residence for weapons. But when police officers attempted to execute the warrant, McManigal refused them entry. Following crisis negotiation, McManigal fired a weapon inside his house and announced, "I just shot my fridge that has the shit in it." This prompted the police SWAT team to intervene, and McManigal fired shots as they approached, narrowly missing some officers and striking police vehicles. Ultimately, police were able to breach the door of McManigal's home with an armored vehicle and place him in custody.[2]

---

2. For his actions during the standoff, McManigal was convicted on two counts of assault on a peace officer. Because McManigal does not appeal those convictions, we give only a cursory recounting of the events surrounding them.

¶6    While in custody, McManigal told police that he was storing triacetone triperoxide (TATP)—an explosive powder—in his downstairs bathroom and in his garage refrigerator. He stated that he had made the TATP "to take matters into his own hands" because people were trying to "screw him out of his inheritance." He indicated that if all the TATP in his house exploded, it would "take out this whole block." McManigal further disclosed that he was storing a liquid explosive, methyl ethyl ketone peroxide (MEKP), in his kitchen refrigerator. McManigal advised against taking "the cork off" the bottle of MEKP because "that shit is fucking crazy." He stated that he had manufactured the MEKP because he "got mad."

¶7    Inside McManigal's house, police indeed found a bottle of MEKP in his kitchen refrigerator, a bucket of TATP in his garage refrigerator, and more TATP in a bin in his downstairs bathroom. In the garage, police also found 7 "switches or ignition-type devices." And in the bathroom, they also observed a cooler, mixing implements, and "some product" on the floor. A "flame test" performed outside the house on some of the powder on a spatula found in the bathroom confirmed that it was TATP. Because "TATP is very sensitive to heat, shock, and friction," bomb squad members did not pass the threshold of the bathroom out of fear of setting off the TATP on the floor.

¶8    Based on a rough estimate of the amount of explosives found in the house,[3] everyone within a 900-foot radius of McManigal's home, some 600 people, were evacuated,[4] a multi-jurisdictional bomb squad was called, and the FBI was

---

3. At trial, testimony regarding the estimated amount of explosives found in the house varied between 20 and 50 pounds.

4. A few of the neighboring houses had already been evacuated in advance of the warrant's execution. Those evacuated also included people at the South Jordan restaurant and other businesses across the street from McManigal's house.

consulted. Various barriers and protective measures were put in place to shield adjacent homes. Using "bomb squad robots," the bucket of TATP and bottle of MEKP were removed from their respective refrigerators. A robot operator testified at trial that he feared that if the bucket of TATP was dropped or "swung too hard, the friction and the impact might have detonated the material inside." The bomb squad then conducted a controlled detonation of the retrieved TATP in a horse-shoe shaped "sandbag bunker" they had constructed in the driveway that was designed to direct the pressure from the explosion upwards into the air. The MEKP was detonated in a hole dug in the front yard. Because the robots could not safely retrieve the TATP from the downstairs bathroom, the bomb squad decided to detonate that explosive inside the home after employing extensive safety measures. The detonations caused some of the sandbags forming the bunker to be thrown between 25 to 30 feet. There was also considerable damage to the interior of McManigal's home. There was no damage to the neighboring houses other than a "piece of siding" that fell off one house, and "it was easily put back up."

¶9 A few months later, McManigal's cousin accidentally caused another explosion in the house while sweeping in the basement, severely injuring himself. The house was later demolished.

*The Trial*

¶10 As relevant to this appeal, the State charged McManigal with 9 counts of possession or use of a WMD—all first-degree felonies.

¶11 At trial, several experts testified regarding the explosives. A member of the FBI's explosives unit testified that TATP is "very unstable and unpredictable." He stated that TATP is categorized as an "improvised primary high explosive," meaning that it produces an explosion moving faster than the speed of sound and "is extremely sensitive to different forms of energy input." He

further testified that depending on purity, density, and particle size, the power of TATP ranges between 50% and 70% of that of TNT. When asked whether TATP is "capable of causing widespread death or serious bodily injury to multiple victims," the agent responded, "I would say that all explosives in the proper amount have the capability to cause death, injury, or destruction."

¶12 Another member of the FBI's explosives unit testified that all the components were present to make the 7 devices found in the garage "actionable IEDs."[5] He further opined that if "fully loaded with TATP or MEKP," each device was capable of causing "widespread death or serious bodily injury to multiple victims."

¶13 The bomb squad commander of the Salt Lake County Unified Fire Authority testified that if a person slipped in the downstairs bathroom, the friction of the fall could have detonated the TATP on the floor, setting off the explosives throughout the house and igniting 200 gallons of diesel fuel that McManigal had been storing just outside of the garage. He opined that the results of such an explosion would have been "catastrophic" as the "large detonation with ignitable liquid in large quantity next to it" would have likely "damaged most of the [adjacent] homes," endangering the residents. He also testified that the 7 devices found in the garage "all had components consistent with" an IED.

¶14 At the close of evidence, defense counsel moved for a directed verdict on all charges, arguing that there was no evidence that any of the items found in McManigal's house, including the TATP and MEKP, constituted WMDs under the relevant statute. The trial court denied the motion, stating that evidence was presented that McManigal designed "seven different items" that, based on expert testimony, were capable of causing "serious bodily injury to multiple people." The court also pointed to evidence that McManigal possessed TATP and MEKP, which

---

5. IED is an acronym for "improvised explosive device."

"were explosives that when combined with those seven triggers were capable of causing serious bodily injury to multiple people."

¶15    The jury convicted McManigal on 6 of the possession of a WMD counts and acquitted him on the remaining 3. Based on the verdict form, the convictions were for possession of the TATP and 5 devices, while the acquittals were for possession of the MEKP and the two remaining devices. McManigal appeals his 6 convictions.

ISSUES AND STANDARDS OF REVIEW

¶16    McManigal raises two issues on appeal. First, he argues that the trial court erred in denying his motion for a directed verdict because (1) the TATP and corresponding devices he was convicted of possessing did not satisfy the statutory definition of a WMD and (2) the evidence presented at trial was insufficient to establish an element of the charged offenses. "We review a trial court's ruling on a motion for directed verdict for correctness." *State v. Gonzalez*, 2015 UT 10, ¶ 21, 345 P.3d 1168. *See also State v. Francis*, 2012 UT App 215, ¶ 3, 284 P.3d 720 (stating that statutory interpretation is a question of law reviewed for correctness). And "when an appellant challenges the denial of a motion for a directed verdict based on the sufficiency of the evidence, the applicable standard of review is highly deferential," meaning we will uphold the trial court's denial "if, when viewed in the light most favorable to the State, some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Hawkins*, 2016 UT App 9, ¶ 32, 366 P.3d 884 (quotation simplified), *cert. denied*, 379 P.3d 1181 (Utah 2016).

¶17    Second, McManigal contends that the jury was inadequately instructed on the statutory definition of a WMD. Because this issue was not preserved for appeal, he asks us to review it for plain error and ineffective assistance of counsel.

"Claims for plain error and ineffective assistance of counsel present questions of law, which we evaluate for correctness." *State v. Samora*, 2022 UT App 7, ¶ 16, 504 P.3d 195, *cert. denied*, 525 P.3d 1254 (Utah 2022).

ANALYSIS

I. The Directed Verdict Motion

¶18 McManigal's challenge to the trial court's denial of his directed verdict motion is two-fold. First, he argues that a "conventional explosive," such as TATP, cannot satisfy the statutory definition of a WMD. Second, he argues that, in any event, insufficient evidence was presented to establish that the explosives in his possession were capable of causing "widespread" death or serious bodily injury to multiple victims. We address each argument in turn.

A. Statutory Definition of a WMD

¶19 McManigal argues that the explosives he was convicted of possessing do not satisfy the statutory definition of a WMD. He asserts that the TATP and its corresponding devices are "[e]xplosive, chemical, or incendiary device[s]" or "[e]xplosive, chemical, or incendiary parts," as defined in Utah Code section 76-10-306(1) (hereafter section 306) and governed by Part 3 of Chapter 10, Title 76 (hereafter Part 3). And, he contends that as such, the TATP and devices—and explosives more generally— cannot satisfy section 76-10-401(6)'s (hereafter section 401) definition of a WMD, which is governed by Part 4 of the same chapter (hereafter Part 4).[6]

---

6. The statutes at issue have since been amended and renumbered. *See* Utah Code Ann. §§ 76-15-210, -301 (LexisNexis Supp. 2025). Unless otherwise indicated, we cite the version of the Utah Code in effect at the time of McManigal's violation of those statutes.

¶20    Subsection 401(6)(a) defines a WMD as follows:

> (i) any item or instrumentality that is designed or intended to cause widespread death or serious bodily injury to multiple victims;
>
> (ii) any item or instrumentality that is designed or intended to cause death or serious bodily injury through the release, dissemination, or impact of toxic or poisonous chemicals, or their precursors;
>
> (iii) any disease organism, including any biological agent, toxin, or vector which is used or intended to be used as a weapon;
>
> (iv) any item or instrumentality that is designed to release radiation or radioactivity at a level dangerous to human life and that is used or intended to be used as a weapon; or
>
> (v) any substance or material or combination which has been prepared or altered for use in the creation of a weapon described in Subsections (6)(a)(i) through (iv).

Utah Code Ann. § 76-10-401(6)(a) (LexisNexis 2017). Subsection 401(6)(b) expressly excludes from the definition of a WMD "firearms or rifle, pistol, or shotgun ammunition, reloading components, or muzzleloading equipment." *Id.* § 76-10-401(6)(b).

¶21    At issue here is whether an explosive, as defined in subsection 306(1),[7] could under certain circumstances also

---

7. It is undisputed that the TATP and corresponding ignition devices found in McManigal's house otherwise satisfy subsection 306(1)'s definition of an "[e]xplosive, chemical, or incendiary device" or "[e]xplosive, chemical, or incendiary parts."

constitute a WMD under subsection 401(6)(a)(i). When interpreting a statute, a court's "primary goal . . . is to ascertain the legislature's intent," the best evidence of which "is the plain language of the statute itself." *McKitrick v. Gibson*, 2024 UT 1, ¶ 31, 541 P.3d 949 (quotation simplified). In so doing, we "presume that the legislature used each word advisedly and read each term according to its ordinary and accepted meaning." *Turner v. Staker & Parson Cos.*, 2012 UT 30, ¶ 12, 284 P.3d 600 (quotation simplified). Accordingly, "wherever possible, we give effect to every word of a statute, avoiding any interpretation which renders parts or words in a statute inoperative or superfluous." *Id.* (quotation simplified). And "when the meaning of a statute can be discerned from its language, no other interpretive tools are needed." *Brindley v. Logan City*, 2023 UT App 46, ¶ 22, 530 P.3d 557 (quotation simplified). *See Oliver v. Utah Labor Comm'n*, 2017 UT 39, ¶ 19, 424 P.3d 22 (stating that under the "plain meaning approach" employed by Utah courts, "we need not look beyond the statute's text to secondary considerations—such as legislative history or the canon that we interpret statutes to avoid absurd results—unless there is ambiguity in the statute") (quotation simplified).

¶22 McManigal argues that subsection 401(6)(a)(i)—which defines a WMD as "any item or instrumentality that is designed or intended to cause widespread death or serious bodily injury to multiple victims"—is a catchall provision that, when viewed together with subsections 401(6)(a)(ii)–(iv), "should be understood as being limited to radiological, toxicological, and biological weapons"—and not as including conventional explosives—under the interpretative canon of ejusdem generis.[8]

---

8. The ejusdem generis canon of statutory interpretation "posits that general catchall terms appearing at the beginning or end of an exemplary statutory list are understood to be informed by the content of the terms of the list." *State v. Bagnes*, 2014 UT 4, ¶ 18, 322 P.3d 719. More specifically, "it declares that in order to give

(continued…)

He also points to section 401's legislative history and its inclusion of additional definitions of "Biological agent," "Toxin," "Vector," and "Delivery system" (which contemplates the dissemination of "a biological agent, toxin, or vector"), *see* Utah Code Ann. § 76-10-401(1), (2), (4) (5), and its lack of definition of "explosive," as supportive of his interpretation. Lastly, he asserts that "[t]o interpret Part 4 as including conventional explosives in its definition of a WMD would render entirely superfluous the most significant criminal provisions of Part 3 relating to the unlawful possession of conventional explosives, explosive devices, and explosive parts." We are unpersuaded.

¶23    McManigal's contention that subsection 401(6)(a)(i) was intended to be "limited to radiological, toxicological, and biological weapons" is belied by a number of provisions in both Part 4 and Part 3. As an initial matter, subsection 401(6)(a)(i)'s position as first on the list—rather than last, as catchall provisions tend to be—particularly when viewed in conjunction with other provisions hereinafter discussed, suggests that the subsection defines a standalone variant of a WMD and is not limited by subsections 401(6)(a)(ii)–(iv). This conclusion is further supported by section 76-10-402, which states,

> A person who without lawful authority intentionally or knowingly manufactures, possesses, sells, delivers, displays, uses, attempts to use, solicits the use of, or conspires to use a weapon of mass destruction or a delivery system for a weapon of mass destruction, *including* any biological agent, toxin, vector, or delivery system as

---

meaning to the general term, the general term is understood as restricted to include things of the same kind, class, character, or nature as those specifically enumerated, unless there is something to show a contrary intent." *Grillone v. Peace Officer Standards & Training Council*, 2025 UT 7, ¶ 23, 567 P.3d 576 (quotation simplified).

those terms are defined in this section, is guilty of a
first degree felony.

Utah Code Ann. § 76-10-402 (LexisNexis 2017) (emphasis added).
Our Legislature has directed that when used in statutes, the term
"'including' means that the items listed are not an exclusive list,
unless the word 'only' or similar language is used to expressly
indicate that the list is an exclusive list." *Id.* § 68-3-12(1)(f) (2021).
Our Supreme Court has also "similarly recognized that the term
is routinely construed as introducing a non-exclusive, exemplary
list." *Larry H. Miller Theatres, Inc. v. Utah State Tax Comm'n*, 2024
UT 8, ¶ 23, 545 P.3d 266 (quotation simplified). Accordingly,
section 76-10-402's use of the term "including" indicates our
Legislature's intent that "biological agent, toxin, vector, or
delivery system" is not an exhaustive list of what may constitute
a WMD.

¶24 Furthermore, several provisions of section 306 expressly
state that explosive, chemical, or incendiary devices or parts are
not under the exclusive purview of Part 3. Subsections 306(3)–(6)
each prohibit specific actions and set forth corresponding felony
classifications relating to explosive, chemical, or incendiary
devices or parts. But each subsection also clarifies that it applies
"under circumstances not amounting to a violation of Part 4,
Weapons of Mass Destruction," thereby giving precedence to Part
4, should it apply. *See* Utah Code Ann. § 76-10-306(3)–(6)
(LexisNexis Supp. 2017). Section 306 thus expressly contemplates
that an explosive, chemical, or incendiary device or part could
constitute a WMD under certain circumstances.

¶25 Lastly, subsection 401(6)(b) expressly excludes from the
definition of a WMD "firearms or rifle, pistol, or shotgun
ammunition, reloading components, or muzzleloading
equipment." It is worth noting that if our Legislature intended
only chemical or radioactive devices—and not explosive
devices—to amount to WMDs under certain circumstances,
subsection 401(6)(b) could have easily been expanded to also

exclude explosives from the definition, particularly given the references in subsections 306(3)–(6) to Part 4. *Cf. Jensen v. Intermountain Healthcare, Inc.*, 2018 UT 27, ¶ 25, 424 P.3d 885 ("We generally assume that each term in the statute was used advisedly, and sometimes find that the use of a term elsewhere shows that the Legislature knows how to use those terms, and would have used them again if it intended the same effect.") (quotation simplified).

¶26 For these reasons, we conclude that based on the plain language of the relevant statutes, subsection 401(6)(a)(i) defines a standalone variant of a WMD that could include "conventional explosives" in certain circumstances, specifically, when such explosives are "designed or intended to cause widespread death or serious bodily injury to multiple victims." Utah Code Ann. § 76-10-401(6)(a)(i). Accordingly, we reject this suggested ground for reversal of the trial court's directed verdict ruling.

B.   Evidence of "Widespread" Death or Serious Bodily Injury

¶27 McManigal alternatively argues that insufficient evidence was presented at trial to establish that the explosives in his possession were "designed or intended to cause *widespread* death or serious bodily injury to multiple victims." *See* Utah Code Ann. § 76-10-401(6)(a)(i) (LexisNexis 2017) (emphasis added). He asserts that the destructive power of the explosives is not a speculative matter in this case because they were actually detonated and "[t]he combined force of the explosions was not sufficient to cause widespread damage, death, or injury" because "no one was injured or killed in the explosions detonated by police"[9] and the resulting damage was limited to the interior of

---

9. Although it is true that no one was injured during the controlled detonation of the explosives, McManigal overlooks that his cousin was severely injured a few months later by merely sweeping some of the TATP powder that remained behind on the floor.

his house and very minor damage to only one neighboring house.[10]

¶28 But a controlled detonation conducted by a multijurisdictional team of experts trained in disposing of explosives in the safest manner possible after evacuating the area and employing extensive safety measures is not determinative of the true extent of the death or serious bodily injury McManigal's stockpile of TATP and ignition devices could have inflicted. Several experts testified regarding the potential danger the explosive material posed. As an initial matter, based on a rough estimate of the amount of explosive material in the house, it was determined that the safe zone was outside a 900-foot radius from the house and approximately 600 people were evacuated as a result. One member of the FBI's explosives unit testified that the devices found in the house were each capable of being "actionable IEDs" and that if "fully loaded with TATP," each device was capable of causing "widespread death or serious bodily injury to multiple victims."

¶29 The bomb squad commander of Salt Lake County's Unified Fire Authority also testified that accidental detonation of the TATP on the bathroom floor in the basement would have been enough to set off the explosives throughout the house, resulting in a "large detonation" that would have been sufficient to reach the 200 gallons of diesel fuel stored outside the garage. Although the commander's estimation that the resulting explosions would be "catastrophic" for the neighborhood also took ignition of the fuel into consideration, this testimony is sufficient to establish that explosions originating within the house would have been

---

10. McManigal also contends that insufficient evidence supported a finding that he "possessed any radiological or toxicological materials, or biological agent, toxin, or vector." But for the reasons discussed in Part I.A above, the statutory definition of a WMD is not limited to the interpretation advanced by McManigal on appeal.

sufficient to, at the very least, extend beyond the house itself. Furthermore, even the controlled detonation of the explosives in the basement—conducted *after* bomb squad robots removed the TATP and MEKP from the kitchen and garage refrigerators— caused severe damage to the interior of the house. Lastly, McManigal's admission to police that detonation of all the TATP in his house would "take out this whole block" is highly probative of how "widespread" he "designed or intended" the explosives' reach to be.

¶30 Ample evidence was thus presented from which a jury could find that the TATP and devices were "designed or intended to cause widespread death or serious bodily injury to multiple victims." *Id.* Therefore, the trial court did not err in denying McManigal's directed verdict motion on this basis.[11]

---

11. We note that while we affirm the trial court's denial of the directed verdict motion, the court's analysis was somewhat wide of the mark. That is, the court's analysis was focused on whether the State presented evidence regarding whether the TATP and devices were designed to "cause serious bodily injury to multiple people." But under subsection 401(6)(a)(i), the court's focus should have been on, with our emphasis, whether the explosives were designed or intended to cause "*widespread* death or serious bodily injury to multiple people." The court's analysis suggests a statutory interpretation limiting "widespread" to "death" and not also applying it to "serious bodily injury." But such an interpretation would assume an intent by our Legislature to place widespread death on par with serious bodily injury occurring to multiple people near each other. We are of the view that our Legislature intended for the clause's two categories to be reconciled with each other by having them each identify a designed or intended result that includes multiple victims over a diffuse area.

## II. Jury Instruction

¶31 Jury Instruction 42 defined a WMD by copying the text of subsections 76-10-401(6)(a)(i), (6)(a)(v), and (6)(b), as follows:

"Weapon of Mass Destruction" means:

1. any item or instrumentality that is designed or intended to cause widespread death or serious bodily injury to multiple victims; or

2. any substance or material or combination which has been prepared or altered for use in the creation of a [WMD].

[WMD] does not include firearms or rifle, pistol, or shotgun ammunition, reloading components, or muzzleloading equipment.

*See* Utah Code Ann. § 76-10-401(6) (LexisNexis 2017). McManigal argues that this definition of a WMD was inadequate, constituting plain error by the trial court.[12]

¶32 "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to

---

12. McManigal also asserts that his defense counsel was ineffective for not objecting to Instruction 42. But his argument wholly omits any discussion of whether failure to object constituted deficient performance—an essential element of an ineffective assistance of counsel claim. *See State v. Moore*, 2025 UT App 26, ¶¶ 28, 31, 566 P.3d 69 (stating that failure to establish either the deficient performance or prejudice prong "is fatal to an ineffective assistance of counsel claim") (quotation simplified), *cert. denied*, 570 P.3d 658 (Utah 2025). Accordingly, McManigal has not carried his burden on appeal on this issue, and we do not address it further. *See Allen v. Friel*, 2008 UT 56, ¶ 9, 194 P.3d 903.

the trial court; and (iii) the error is harmful." *State v. Johnson*, 2017 UT 76, ¶ 20, 416 P.3d 443 (quotation simplified). As relevant here, "for an error to be obvious to the trial court, the party arguing for the exception to preservation must show that the law governing the error was clear, or plainly settled, at the time the alleged error was made." *Id.* ¶ 21 (quotation simplified).

¶33 McManigal faults Instruction 42 for not defining "widespread" and for not including the full text of subsection 401(6). Although "widespread" is not statutorily defined, McManigal asserts that it should have been defined in the context of subsections 401(6)(a)(ii)–(iv), which were excluded from Instruction 42—i.e., "'toxic or poisonous chemicals,' 'disease organism, including any biological agent,' or a 'toxin, radiation, or radioactivity.'" *See* Utah Code Ann. § 76-10-401(6)(a)(ii)–(iv). That is, he argues, it should have been defined in terms of what is considered "widespread" for those specific instrumentalities. Relatedly, McManigal asserts that Instruction 42 should have also included the text of subsections 401(6)(a)(ii)–(iv) "so that the jury would understand that the widespread instrumentality in subsection [401(6)(a)(i)] should cover an area similar to" that of the instrumentalities covered in the excluded subsections. But in Part I.A of this opinion, we rejected this interpretation of subsection 401(6)(a)(i), concluding that based on the plain language of the relevant statutes, subsection 401(6)(a)(i) was intended to define a standalone variant of a WMD. Accordingly, failure to include McManigal's proffered definition of "widespread" did not constitute error, much less obvious error. And the exclusion of subsections 401(6)(a)(ii)–(iv) from the instruction likewise was not error as they define variants of WMDs that were not at issue in this case.

¶34 Generally speaking, "non-technical words of ordinary meaning should not be elaborated upon in the instructions given by the court. It is presumed that jurors have ordinary intelligence and understand the meaning of ordinary words." *State v. Frausto*, 2002 UT App 259, ¶ 19, 53 P.3d 486 (quotation simplified), *cert.*

*denied*, 63 P.3d 104 (Utah 2002). "In contrast, an instruction defining a term is necessary when the term has a technical legal meaning so different from its ordinary meaning that the jury, without further explanation, would misunderstand its import in relation to the factual circumstances." *State v. Ekstrom*, 2013 UT App 271, ¶ 15, 316 P.3d 435 (quotation simplified). The term "widespread" is well within the ken of a person of ordinary intelligence. For this reason, the lack of a definition of "widespread" in the jury instructions also did not constitute obvious error.

¶35    In sum, we reject McManigal's claims of error relating to Instruction 42. Accordingly, the trial court did not plainly err in providing that instruction to the jury.


CONCLUSION

¶36    The trial court correctly denied McManigal's directed verdict motion. The court also did not plainly err in instructing the jury on the definition of a WMD.

¶37    Affirmed.

_____